**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TAMARA JEAN BRAGG,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:06-CV-1409-N (BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of Title 28, United States Code, § 636(b)(1)(B), and Special Order No. 3-251, the District Court referred this case for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff, Tamara Jean Bragg's, Cross Motion for Summary Judgment* ("Pl. Mot.") with brief in support ("Pl. Br."), filed December 4, 2006; *Commissioner's Motion for Summary Judgment* ("Def. Mot.") with brief in support ("Def. Br."), filed March 8, 2007; and *Plaintiff's Reply* ("Pl. Reply"), filed March 19, 2007. Having reviewed the evidence of the parties in connection with the pleadings, the Court recommends that *Plaintiff's Cross Motion for Summary Judgment* be **GRANTED,** the *Commissioner's Motion for Summary Judgment* be **DENIED**, and the case be remanded to the Commissioner for further proceedings.

## I. BACKGROUND[1]

### A. Procedural History

Tamara Jean Bragg ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "Tr."

benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1382.  On April 8, 2003, Plaintiff

applied for supplemental security income.  (Tr. at 103-06, 128-31.)  Plaintiff claimed that recurrent,

chronic pain in her left side, lower back, and hip rendered her unable to work since November 13,

1990.  (*Id.* at 119).  The Social Security Administration denied Plaintiff's application initially and

upon reconsideration.  (*Id.* at 55, 63.)  Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ").  (*Id.* at 66.)  A hearing, at which Plaintiff appeared only through counsel, was held

on December 9, 2004.[2]  (*Id.* at 479-93.)  On January 20, 2005, the ALJ issued a written decision

finding Plaintiff not disabled.  (*Id.* at 25-32.)  The Appeals Council found no reason to review the

ALJ's decision and denied Plaintiff's request for review.  (*Id.* at 6.)  Consequently, the ALJ's

decision is the final decision of the Commissioner.  (*Id.*)  Plaintiff appealed the Commissioner's

decision to this Court pursuant to 42 U.S.C. § 405(g) on August 1, 2006.

## B.  Factual History

### 1.  Age, Education, and Work Experience

Plaintiff was born on June 12, 1962. (Tr. at 132.)  At the time of the hearing before the ALJ,

she was 42 years old and had a high school general equivalency degree.  (*Id.* at 134, 489-90.)  She

had no past relevant work experience.  (*Id.* at 31, 488.)

### 2.  Medical Evidence[3]

Plaintiff's earliest  medical records show a January 5, 1994 diagnosis of chronic low back

pain and muscle hernias in her lower extremities.  (Tr. at 396-97.)  To alleviate the pain from the

hernias, Plaintiff underwent surgery.  (*Id.* at 399-400.)  The medical record further reflects that

---

[2]  An earlier hearing was postponed because Plaintiff had submitted new evidence.  (*See* Tr. at 469-76.)

[3]  The Court limits its recitation of the medical evidence to the medical record relevant to the issues before it.

Plaintiff tore ligaments in her left ankle in August 1996.  (*See id.* at 382-85.)

On March 3, 1997, G.W. Chandler, D.P.M.,[4] examined Plaintiff due to complaints of left leg pain secondary to limb length inequality.  (*Id.* at 345.)  He noted an extensive medical history, including headaches, ear infections, hypertension, back problems, depression, and bilateral carpal tunnel surgery.  (*Id.*)  After agreeing that Plaintiff suffered from left limb length inequality, the doctor informed her that he planned to refer her for an accommodative inlay but she "opted not to pursue" such inlay because she was indigent.  (*Id.* at 345-46.)

In February 1998, Plaintiff reported pain and swelling in her left knee, but x-rays revealed no bony abnormalities.  (*Id.* at 380.)  In September 1998, Plaintiff visited a hospital with complaints of headaches.  (*Id.* at 374.)

On January 18, 2000, Plaintiff visited an Emergency Room ("ER") with complaints of neck, shoulder, and knee pain.  (*Id.* at 335.)  Radiology notes reflected no abnormality in the spine, knee, or shoulder at that time.  (*Id.* at 336-37, 229-40.)  On April 12, 2000, Plaintiff returned to the ER with complaints of depression.  (*Id.* at 333.)

A radiology report dated August 8, 2000, noted a tear in the medial meniscus of Plaintiff's left knee.  (*Id.* at 332.)  Complaints of headaches resulted in unremarkable MRIs of Plaintiff's brain and cervical spine on November 15, 2000.  (*Id.* at 329-30.)

Medical records dated March 16, 2001, reflect that Plaintiff "no longer take[s] medications for pain or otherwise, unless life or death, because of lethal side effects [she has] experienced."  (*Id.* at 350, 424.)  Plaintiff returned to Dr. Chandler on March 28, 2001, with complaints of leg, back, and knee pain.  (*Id.* at 344.)  He again noted her extensive medical history and added that she had

---

[4]  "D.P.M." generally signifies "Doctor of Podiatric Medicine", also known as a podiatrist.

a history of "carpal tunnel syndrome in both wrists since 1981." (*Id.*) Dr. Chandler explained to Plaintiff that her chief complaints were orthopedic (knee and back pain) rather than podiatric in nature, and she should follow up with appropriate physicians. (*Id.*) Dr. Chandler further explained that he did not do disability evaluations, and noted that Plaintiff had "an almost compulsive, obsessive behavior with medical documentation of her complaints and pain, and why she cannot work, and requires financial assistance." (*Id.*)

On April 10, 2001, Randy D. Dreschel, M.D., diagnosed Plaintiff with fibromyalgia and indicated that she is permanently disabled because of her mental and physical condition. (*Id.* at 254, 461.)[5] The medical record reflects that Plaintiff was indigent without financial means to pay for the medical treatment. (*Id.*)

Progress notes dated October 2001 from an unidentified physician reveal complaints of an earache secondary to a possible "perio infection or TMJ disorder."[6] (*Id.* at 292.) Medical records from December 2001 show that Plaintiff had an ear infection. (*Id.* at 365-67.)

On January 9, 2002, Plaintiff visited her treating physician, Edgar Janetzko, M.D., complaining of right ear pain and a racing heart. (*Id.* at 253.) Dr. Janetzko assessed the symptoms as allergic rhinitis and arrhythmias and prescribed medication. (*Id.*) In March and February 2002, Dr. Janetzko assessed TMJ based on Plaintiff's complaints.[7] (*Id.* at 245, 248-50.) Because Plaintiff complained of neck pain with radiculopathy on March 18, 2002, Dr. Janetzko ordered a CT scan of

---

[5] The physician's last name on the medical record is illegible, but Plaintiff identifies the physician as Dr. Dreschel. (*See* Pl. Br. at 7.) The medical record contains various spellings for the last name. (*See*, *e.g.*, Tr. at 349, 423, 458.)

[6] A medical expert at the hearing before the ALJ testified that TMJ is an acronym for temporal mandibular joint dysfunction – a disorder of the jaw joints. (Tr. at 483.)

[7] Dr. Janetzko's February 12, 2002 and March 26, 2002 assessments also include trigeminal neuralgia (Tr. at 245, 250), a condition that relates to a cranial nerve in the facial area which can cause pain (*id.* at 482-83).

the cervical spine, head, and brain – all of which revealed no abnormalities. (*Id.* at 246-48.) In light of continued complaints of an earache, he referred Plaintiff to an ear, nose, and throat specialist. (*Id.* at 245.)

On such referral, Louis Renault, M.D., examined Plaintiff on April 5, 2002. (*Id.* at 183.) At that time, Plaintiff was taking over-the-counter medication for nasal drainage, and aspirin as needed. (*Id.*) Plaintiff also indicated that she had "one nerve pill left" but did not "like taking it because it spaces her out." (*Id.*) The doctor opined that TMJ caused Plaintiff's earache. (*Id.*) He gave her a sample of Nasacort and prescribed Diflucan. (*Id.* at 184.)

On April 17, 2002, Plaintiff returned to Dr. Janetzko because she had been coughing for three weeks with production of yellow phlegm. (*Id.* at 244.) From her complaints, Dr. Janetzko assessed TMJ and bronchitis. (*Id.*) That same day, Timothy P. Oltersdorf, M.D., found that Plaintiff had chronic obstructive pulmonary disease ("COPD"). (*Id.* at 199, 236.) A pulmonic function study conducted April 23, 2002, revealed a "mild obstructive ventilatory pattern, with significant response to inhaled bronchodilator." (*Id.* at 188.)

On November 4, 2002, Dr. Janetzko diagnosed Plaintiff with fibromyalgia and degenerative disc disease and indicated that she had been permanently disabled because of her mental and physical condition since 1988. (*Id.* at 243, 457.) Plaintiff presented a variety of complaints to Dr. Janetzko on January 13, 2003, resulting in an assessment of lymphadenopathy,[8] back pain, and "headaches/tension, migraines." (*Id.* at 242.)

On March 12, 2003, Narendra Patel, M.D., examined Plaintiff at the request of the Texas Rehabilitation Commission. (*Id.* at 210-13.) He noted a history of pain in her lumbar spine and left

---

[8] A medical expert testified at the hearing before the ALJ that lymphadenopathy is an enlargement of the lymph nodes. (*See* Tr. at 484.)

hip area since 1998; COPD since being informed that she had "allergic asthma due to exposure to environmental smog" in 2001; and cardiac arrhythmias or palpitations for prior four years which were adequately treated with calcium and magnesium. (*Id.* at 211-12.) Further, although Plaintiff had been given an inhaler in 2002, the doctor noted that she had used it only five or six times because she believed such chemicals "have a lot of side effects" and preferred to use herbal medication and vitamins. (*Id.*) Plaintiff had swollen gums (previously referred to as benign growths) that Dr. Patel viewed as indicating a sinus infection. (*Id.*) Physical examination revealed normal, clear breathing; normal spine curvature; an ability to bend and squat; no edema of the extremities; and some discomfort in both legs caused by straight leg raising. (*Id.* at 212-13.) Dr. Patel diagnosed allergic asthma; palpitations; benign growths in upper gum; sinusitis; and musculoskeletal sprains of the lumbar spine, left hip area, and left posterior scapular area. (*Id.* at 213.)

Plaintiff returned to Dr. Janetzko with multiple complaints later in March, April, and May 2003. (*Id.* at 233, 237-38.) In March, he assessed possible irritable bowel syndrome ("IBS"). (*Id.* at 238.) In April, he assessed IBS and prescribed medication. (*Id.* at 237.) He assessed possible sinusitis after the May physical examination revealed wheezing. (*Id.* at 233.) A May 13, 2003 radiology report revealed "no CT evidence of sinusitis." (*Id.* at 303-04.) The next day, Plaintiff complained of right jaw pain and "off and on" anxiety. (*Id.* at 302.)

On May 13, 2003, Venkateswara-Rao Namburu, M.D., examined Plaintiff secondary to abdominal pain and colonoscopy. (*Id.* at 280-81.) He noted medications of Zelnorm, aspirin, and vitamins. (*Id.* at 280.) A week later, Plaintiff underwent a colonoscopy. (*Id.* at 278-79.)

On June 9, 2003, Plaintiff presented numerous complaints to Dr. Janetzko resulting in an assessment of migraines and low back pain. (*Id.* at 298, 312.) That same date, Dr. Janetzko noted

that Plaintiff was permanently disabled with a primary disabling diagnosis of chronic low back pain with secondary disabling diagnoses of fibromyalgia and migraines. (*Id.* at 456.) The report also contains a comment: "chostochondritis" and "chest pain". (*Id.*) Dr. Janetzko found Plaintiff's activities in an eight-hour work day to be limited in the following respects: (1) one hour for sitting; (2) fifteen minutes for standing; (3) fifteen minutes for walking; (4) thirty minutes for keyboarding; and (6) inability to climb, kneel, squat, stoop, bend, push, pull, lift, or carry. (*Id.*) He opined that Plaintiff was limited to lifting or carrying objects weighing less than five pounds and for not more than one hour per day, and that Plaintiff could not participate in work activities such as answering phones or filing while seated. (*Id.*)

On July 29, 2003, Dr. Janetzko assessed Plaintiff's residual functional capacity ("RFC"). (*See id.* at 434-39.) In light of Plaintiff's impairments, Dr. Janetzko indicated that in an eight-hour work day, Plaintiff would be able to sit for no more than one hour; stand or walk for no more than thirty minutes; and need to lie down or recline for the other six and one half hours. (*Id.* at 434.) Plaintiff would need to change positions frequently due to pain – every ten minutes when sitting and every four minutes when standing, and she was limited to carrying or lifting five pounds. (*Id.* at 434-35.) Plaintiff would be limited with respect to repetitive action involving simple grasping with her right hand, pushing and pulling with both hands, and operating foot controls with her left foot. (*Id.* at 435.) Plaintiff's impairments would preclude crawling and limit her to occasional squatting, climbing, stooping, crouching, and kneeling, but she could frequently bend and reach up. (*Id.* at 436.) With her impairments, Plaintiff could occasionally tolerate exposure to unprotected heights, moving machinery, marked changes in temperature, dust, fumes, gases, smoke, and perfumes and frequently tolerate exposure to driving automotive equipment, but she could tolerate no exposure

to noise. (*Id.*) Dr. Janetzko found that Plaintiff had moderate, chronic pain that would cause marked handicap in the performance of activities precipitating pain, and that she would frequently miss work due to her pain. (*Id.* at 437.) He also found that she would need frequent rest periods during the day and would be an unreliable worker. (*Id.* at 437-38.) He concluded that she became disabled on February 12, 2002. (*Id.* at 438.)

On September 18, 2003, Thomas Truelson, M.D., examined Plaintiff for bladder complaints. (*Id.* at 265-66.) Plaintiff was taking no medications at that time and provided no history of musculo-skeletal problems. (*Id.* at 265.) Among other things, she denied headaches, palpitations, joint pain, neck pain, significant back pain, wheezing, and swollen lymph glands. (*Id.*) The next day, Donna M. Duran, M.D., examined Plaintiff due to complaints of bladder pain and likewise noted no current medications. (*Id.* at 352-53.)

Plaintiff continued to complain about migraines to Dr. Janetzko in September and October 2003. (*See id.* at 309-10.) Her October 2003 complaints resulted in an assessment of possible fibro-myalgia, which was updated to a diagnosis of fibromyalgia on November 15, 2003. (*Id.* at 308-09.)

On October 23, 2003, Frank J. Rodriguez Jr., M.D., evaluated Plaintiff regarding left lower extremity and lower back pain. (*Id.* at 445-54.) He found Plaintiff's presentation "very unusual" and noted that "[h]er subjective complaints are far out of proportion to her physical findings, yet she appears to be genuinely incapacitated by these." (*Id.* at 445.) He believed that she has "a person-ality type disorder in addition to her anxiety disorder." (*Id.*) His impression was that she was in-capable of gainful employment. (*Id.*) In a letter to Dr. Janetzko, Dr. Rodriguez indicated that "there does not appear to much physical basis for her complaints", but she appears to have a "personality type disorder, which likely limits her from being functional." (*Id.* at 446.)

At the request of Plaintiff's attorney, Dr. Rodriguez also assessed Plaintiff's RFC as of October 23, 2003. (*See id.* at 426-31.) In light of Plaintiff's physical and psychological impairments, Dr. Rodriguez indicated that in an eight-hour work day, Plaintiff would be able to sit for no more than thirty minutes, stand or walk for no more than thirty minutes, and she would need to lie down or recline for the other seven hours. (*Id.* at 426.) He indicated that Plaintiff would need to change positions frequently due to pain – every four to five minutes when sitting and every two to three minutes when standing. (*Id.*) Per Dr. Rodriguez, Plaintiff could never lift or carry up to ten pounds, and she would be limited with respect to repetitive action involving simple grasping, pushing and pulling, and operating foot controls. (*Id.* at 427.) Plaintiff's impairments would preclude crawling and limit her to occasional bending, squatting, climbing, reaching up, stooping, crouching, and kneeling. (*Id.* at 428.) Her impairments would preclude exposure to unprotected heights, moving machinery, marked changes in temperature, dust, fumes, gases, smoke, perfumes, and noise. (*Id.*) Her impairments would limit her to occasionally driving automotive equipment. (*Id.*) Dr. Rodriguez found that Plaintiff had severe pain that would preclude activity that would precipitate such pain. (*Id.* at 429.) He noted that Plaintiff would frequently miss work due to her pain and would need frequent rest periods during the day. (*Id.*) He concluded that Plaintiff was unable to work and would be an unreliable worker. (*Id.* at 430-31.)

Between October and December 2003, Plaintiff underwent various tests secondary to chest pains. (*Id.* at 406-18.) One medical report from that time period indicates that Plaintiff quit taking medications due to urinary burning. (*Id.* at 409.)

On November 4, 2003, John A. Malonis, M.D., examined Plaintiff due to complaints of pain in her left, lower back. (*Id.* at 347.) He noted that (1) Plaintiff obtained slight pain relief from pain

pills, muscle relaxers, and aspirin; (2) "she definitely has some irritable bowel syndrome"; and (3) her medical history was also positive for fibromyalgia, costochondritis, and multiple somatic complaints. (*Id.*) X-rays revealed "no evidence of any significant scoliosis", although Plaintiff did "have some slight lower lumbar disc space narrowing but nothing terrible." (*Id.*)

On April 21, 2004, Dr. Janetzko noted that Plaintiff was permanently disabled with a primary disabling diagnosis of chronic low back pain with secondary disabling diagnoses of fibromyalgia and migraines. (*Id.* at 306.) The report also contains the comment, "chostochondritis." (*Id.*) Dr. Janetzko found Plaintiff's activities in an eight-hour work day to be limited in the following respects: (1) one hour for sitting; (2) twenty minutes for standing; (3) thirty minutes for walking; (4) fifteen minutes for climbing; (5) thirty minutes for keyboarding; and (6) inability to kneel, squat, stoop, bend, push, pull, lift, or carry. (*Id.*) He opined that Plaintiff was limited to lifting or carrying objects weighing less than five pounds and for not more than one hour per day, and that Plaintiff was unable to participate in work activities such as answering phones or filing while seated. (*Id.*)

### 3. Psychological or Psychiatric Evidence

A psychological evaluation dated December 30, 2002, reveals reported complaints of left low back pain since 1988, a left leg imbalance that causes pain and multiple falls, migraines, hypertension, fascia hernias in her ankles, edema, tendonitis, pain in left knee, COPD, costochondritis, and depression from these impairments. (Tr. at 206.) Plaintiff reported taking aspirin for her pain, using an antidepressant in 1995, and using herbs and nutritious foods to treat her ailments. (*Id.*) She was diagnosed with three psychological disorders: (1) undifferentiated somatoform disorder; (2) pain disorder associated with psychological factors and general medical condition; and (3) major depressive disorder. (*Id.* at 209.)

On March 21, 2003, Leela Reddy, M.D., found no severe medical impairment but did find an unspecified "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Speciality." (*Id.* at 218.) Although she found the presence of a medically determinable impairment, "somatoform disorder undifferentiated", the disorder did not satisfy the listing requirements for a somatoform disorder. (*Id.* at 224.) According to Dr. Reddy, the disorder imposed no limitation on Plaintiff. (*Id.* at 228-29.) She found Plaintiff's vague, physical complaints "exaggerated [and] not credible" and her alleged limitations "not fully credible." (*Id.* at 230.)

A year later, on March 31, 2004, Valerie V. Meshack, M.D., conducted a psychiatric examination of Plaintiff. (*Id.* at 255-60.) She noted a history of depression and back and hip pain. (*Id.* at 255.) Plaintiff indicated that she was "very reluctant to take prescribed medications because she is fearful of side effects", preferred alternative medicine, but would take aspirin occasionally to help with her pain. (*Id.* at 255-56.) Dr. Meshack diagnosed "Major depressive disorder, recurrent. Rule out somatoform disorder." (*Id.* at 258.)

Because she recognized that Plaintiff's obsession with her physical symptoms appeared "to interfere with her ability to think about anything else", Dr. Meshack found that Plaintiff's psychiatric condition affected her ability to understand, remember, and follow instructions. (*Id.* at 259.) More specifically, Dr. Meshack found that Plaintiff's condition slightly restricted her ability to understand, remember, and follow simple instructions and moderately restricted such ability with respect to detailed instructions. (*Id.*) Plaintiff's condition also moderately restricted her ability to make judgments on simple work-related decisions. (*Id.*)

Due to Plaintiff's preoccupation with herself and her impairments, Dr. Meshack found that she "would probably have difficulty relating to others" and her psychiatric condition would affect

her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting. (*Id.* at 260.)  More specifically, Dr. Meshack found moderate restrictions regarding appropriate interaction with the public and Plaintiff's ability to respond appropriately to work pressures in the work place and to changes in a routine work setting.  (*Id.*)  The doctor found slight restrictions regarding appropriate interaction with supervisors and co-workers.  (*Id.*)

### 4. Hearing Testimony

A hearing was held before the ALJ on December 9, 2004.  (Tr. at 479.)  Plaintiff appeared only through her attorney.  (*Id.*)  Medical and vocational experts testified at the hearing.  (*See id.* at 480-92.)

As the Commissioner's medical expert ("ME"), Dr. John Simons testified about Plaintiff's impairments and their severity.  (*Id.* at 480-86.)  He recognized that Plaintiff had (1) mild COPD; (2) a benign growth at the gum; (3) a diagnosis of fibromyalgia; and (4) various complaints of aches and pain which probably limited her to light work, although none of them met any listing requirement.  (*Id.* at 480-81.)  With respect to her psychiatric impairments, he recognized that she was diagnosed with a depressive disorder and had a possible somatoform disorder that was not officially diagnosed.  (*Id.* at 481.)  In light of the depression, he concluded that Plaintiff would be limited to superficial contact with the public and to minimal details in instruction.  (*Id.*)

With respect to the possible somatoform disorder, Dr. Simon described it as a perceived dysfunction that is "all in your head" because there is nothing physically wrong with the body but different than malingering because the patient is not lying about being unable to do certain things. (*Id.* at 484-85.)  Although a person with somatoform disorder has no actual physical dysfunction, the physical problems perceived by such person would be "real to the person experiencing" them.

(*Id.* at 485.)  There is no medicine to treat somatoform disorder.  (*Id.* at 486.)

The vocational expert (VE) testified that a hypothetical person of the same age, education, and lack of work experience as Plaintiff who was limited to light work involving no more than minimal detailed work instructions and only superficial contact with the public could perform three types of jobs:  (1) janitor cleaner at the light level; (2) laundry worker at the light level; and (3) a simple hand laborer or simple assembler. (*Id.* at 487-88.)  For each of these jobs, 4,000 to 6,000 positions existed in Texas, and more than 80,000 positions existed in the national economy.  (*Id.*)

The hypothetical person would be unable to perform any job in the national economy if she had the following limitations:  (1) slight impairment with understanding, remembering, and following simple instructions; (2) moderate impairment with detailed instructions and making judgments or simple work-related decisions; (3) moderate impairment with public interaction and appropriate responses to work pressures and changes in the routine work setting; (4) slight impairment with appropriate interaction with supervisors and coworkers; (5) no more than one hour of sitting in an eight-hour workday; (6) maximum standing of twenty minutes; (7) maximum walking thirty minutes; (8) maximum stair-climbing fifteen minutes; (8) inability to kneel, squat, bend, stoop, push, or pull; and (9) no lifting or carrying objects weighing more than five pounds or for more than one hour per day.  (*Id.* at 489.)  Likewise, the hypothetical person would be unable to perform any job in the national economy if she had the limitations set out in the RFC assessments by Drs. Janetzko and Rodriguez in July and October 2003.  (*See id.* at 490-91 (setting out hypothetical questions to the VE based upon such RFC assessments).)

## C.  ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on January 20,

2005. (Tr. at 25-32.) The ALJ noted that Plaintiff was not entitled to supplemental security income benefits prior to the date of her application, April 8, 2003. (*Id.* at 26.) He found that Plaintiff had no past relevant work history and had not engaged in substantial gainful activity since the date of her application. (*Id.*) He next found that Plaintiff had a combination of severe impairments: irritable bowel syndrome, left leg length inequality, left knee medial meniscus tear, fibromyalgia, TMJ, musculoskeletal pain in the lumbar spine and left hip, major depression disorder, somatform disorder, and pain disorder. (*Id.*) Plaintiff, however, had no impairment or combination of impairments that satisfied the criteria of any impairment listed in the social security regulations. (*Id.* at 27.)

In determining Plaintiff's RFC, the ALJ considered medical reports which showed that Plaintiff did not believe in taking medication for her impairments and that her daily living activities involved house cleaning, cooking, caring for her dogs, and watching television. (*Id.*) The ALJ also considered testimony from the medical expert and various medical records. (*Id.* at 27-29.) Although he recognized Plaintiff's psychological diagnoses, he concluded that the psychological impairments merely limited Plaintiff's ability to relate to others and to handle complex instructions. (*Id.* at 29.) Furthermore, although the ALJ recognized medical reports which indicated that Plaintiff was unable to work, he dismissed them as not supported by objective clinical findings and being contrary to her actual level of functioning. (*Id.*) While the ALJ found that Plaintiff had a combination of severe impairments, he found her testimony not entirely credible nor reasonably supported by the objective medical evidence to the extent that she alleged she was completely unable to engage in any work-related activities. (*Id.*) Consequently, the ALJ concluded that Plaintiff retained the residual functional capacity to perform a wide range of vocational demands for light work activity involving minimal detailed instructions and only superficial contact with others. (*Id.* at 28, 30.)

14

Although Plaintiff had no past relevant work history, the ALJ considered Plaintiff's residual functional capacity, relevant vocational characteristics, and testimony from the VE to conclude that she retained the RFC sufficient to make a vocational adjustment to jobs existing in significant numbers in the national economy. (*Id.* at 26, 30.)

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the deter-

mination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.* at 436 & n.1.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony*, 954 F.2d at 292.

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## B. Issues for Review

Plaintiff presents the following issues for review:

(1) the ALJ erred in not properly considering all of her severe impairments, the effects of those impairments, and the opinions of the treating and examining physicians of record;

(2) the ALJ erred in his evaluation of her residual functional capacity by not including all limitations supported by the record; and

(3) the ALJ failed to carry his burden at Step 5 of the evaluative process to show that she retained the ability to perform work existing in significant numbers in the national economy.

(Pl. Br. at 1-14.)

## C. Issue One: Severe Impairments

Plaintiff contends that the ALJ erred in not properly considering all of her severe impairments, the effects of those impairments, and the opinions of the treating and examining physicians of record. The Court separately considers these multiple issues.

## 1.     *Failure to Consider*

In particular, Plaintiff contends that the ALJ failed to acknowledge her COPD, carpal tunnel, and migraine headaches as severe impairments.  (Pl. Br. at 5-6.)

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  The Fifth Circuit has held that a literal application of § 404.1520(c)[9] would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute.  *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985).  Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Id*. at 1101.  Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity."  *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used."  *Id*. at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Eisenbach v. Apfel*, No. 7:99-CV-0186-BC, 2001 WL 1041806, at \*6 (N.D. Tex.

---

[9] Section 1520(c) provides the applicable definition of severe impairment for claims for disability insurance benefits under Title II, whereas § 416.920(c) applies to claims for supplemental security income under Title XVI.  As discussed previously, the relevant law and regulations governing the two types of claims are identical, and the courts may rely on decisions in both areas without distinction.  *See Davis v. Heckler*, 759 F.2d 432, 435-36 & n.1 (5th Cir. 1985).

Aug. 29, 2001). Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Unless the correct standard of severity is used, the claim must be remanded to the Secretary for reconsideration. *Stone*, 752 F.2d at 1106.

The ALJ found that Plaintiff suffered from the following severe impairments: irritable bowel syndrome; left leg length inequality; left knee medial meniscus tear; fibromyalgia; TMJ; musculo-skeletal pain in the lumbar spine and left hip; major depression disorder; somatform disorder; and pain disorder. (Tr. at 26.) In evaluating the severity of Plaintiff's impairments, he cited 20 C.F.R. § 416.905[10] and stated: "An impairment is severe within the meaning of the regulations if it imposes more than slight restrictions on the ability to perform basic work activities and such impairment exists for at least twelve consecutive months, or expected to result in death." (Tr. at 26.) Although *Stone* modified the applicable definition of severity found in the regulations, *see* 752 F.2d at 1101, the ALJ did not explicitly cite to *Stone* in his written opinion (*see* Tr. at 25-32).

Citing *Harrell v. Bowen*, 862 F.2d 471 (5th Cir. 1988), the Commissioner argues that the *Stone* standard does not apply because the ALJ found other impairments severe and did not deny benefits at Step 2. (Def. Br. at 5-6.) Alternatively, the Commissioner argues that even if the *Stone* standard applies in this case, "the ALJ performed a thorough analysis of the evidence in reaching his conclusion." (*Id.* at 6.) Neither argument is persuasive. *Harrell* merely cites *Stone* in the following context: "Even if an impairment is deemed 'severe' under the standard of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir.1985), this fact does not require a remand when the Secretary has gone beyond the second step, as here, as not all 'severe' impairments are disabling." 862 F.2d at 481.

---

[10] Section 416.905 provides the basic definition of disability for adults, not a specific definition of severe impairment.

Whether the ALJ denied benefits at Step 2 or later in the sequential evaluation process, the definition of severe impairment remains the same. A failure to use the correct standard of severity is sufficient to remand for further consideration even when the denial of benefits occurred subsequent to Step 2 of the sequential process. *See Loza v. Apfel*, 219 F.3d 378, 393, 398-99 (5th Cir. 2000) (Step 5 adjudication). The Commissioner's argument has been previously rejected in this district. *See Key v. Astrue*, No. 3:06-CV-1087-N, 2007 WL 2781930, at *4 (N.D. Tex. Sept. 4, 2007) (accepting findings and recommendation of Mag. J.). Furthermore, a thorough analysis of the evidence under an erroneous standard does not cure the procedural defect in the ALJ's analysis.

The Commissioner also argues that the ALJ properly concluded that Plaintiff's COPD was not severe in light of the medical record; the ALJ's statement regarding Plaintiff's COPD reflects that although the ALJ found that Plaintiff experienced mild COPD, he found that the impairment was not severe and did not meet a listing. (Def. Br. at 3-4.) Relatedly, he argues that the evidence supports the conclusion that Plaintiff's COPD did not affect her basic work activities. (*Id.* at 5.) By failing to include COPD in his list of severe impairments (*see* Tr. at 26, 31), the ALJ implicitly indicated that he did not consider COPD as a severe impairment. Step 2 of the evaluative process imposes a duty upon the ALJ to consider the medical severity of a claimant's impairments. *See* 20 C.F.R. § 416.920(a); *Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment Is Severe*, SSR 96-3p, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). The ALJ's brief reference to COPD (*see* Tr. at 27) does not fulfill his duty to consider the medical severity of that impairment, and provides insufficient support to find that the ALJ concluded that it was not severe.

Additionally, it is immaterial on these facts whether the evidence supports an unstated con-

clusion that Plaintiff's COPD did not affect her basic work activities because "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Reviewing courts do not consider rationales supporting an ALJ's decision that are not invoked by the ALJ. *See Bagwell v. Barnhart*, 338 F. Supp. 2d 723, 735 (S.D. Tex. 2004). It is apparent from the ALJ's decision that the ALJ was merely reciting the ME's testimony as it relates to the ALJ's determination of Plaintiff's RFC. (*See* Tr. at 27.) RFC comes into play at Step 4 of the sequential evaluative process, not Step 2. *See* 20 C.F.R. § 416.945(a)(5)(i) ("We will first use our residual functional capacity assessment at step four of the sequential evaluation process to decide if you can do your past relevant work.").

The Commissioner lastly argues that Plaintiff has not carried her burden to show that her carpal tunnel or migraines equate to severe impairments. (Def. Br. at 6.) He contends that Plaintiff provides no evidence that these conditions affected her ability to work as of April 2003, and that Plaintiff has failed to carry her burden to establish a medically determinable impairment. (*Id.*) The record contains two notations regarding a history of carpal tunnel, and several notations and diagnoses regarding migraines between March 1997 and April 2004. (*See* Tr. at 242, 298, 306, 309-10, 329-30, 344-45, 374, 456.) Dr. Janetzko twice concluded that Plaintiff was permanently disabled with a secondary disabling diagnosis of migraines. (*Id.* at 306, 456.) Two doctors specifically recognized that Plaintiff was limited in her ability to perform repetitive actions with her hand or hands. (*See* Tr. at 427, 435.) In light of these medical records, the ALJ had a duty to assess whether carpal tunnel or migraines constituted a severe impairment at Step 2. The ALJ, however, did not acknowledge the presence of either impairment. (*See generally* Tr. at 25-32.)

In conclusion, the ALJ set forth the incorrect statutory regulation and provides no indication

that he applied the correct legal standard as set forth in *Stone*.  Further, the ALJ erred in the consideration given to Plaintiff's potentially severe impairments.  The Commissioner's arguments are not persuasive, and this case should be remanded with directions to the ALJ to apply the correct legal standard for severity as set forth in *Stone* and consider the alleged severe impairments of COPD, carpal tunnel, and migraines.

### 2.  *Treating Physicians*

Plaintiff argues that the ALJ discounted opinions of Drs. Janetzko, Rodriguez, and Dreschel, without recognizing them as treating physicians or conducting a detailed analysis of their opinions as required by 20 C.F.R. § 416.927(d)(2) and case law.  (Pl. Br. at 7-8.)  In addition, she contends that the ALJ failed to acknowledge Dr. Chandler's diagnosis of carpal tunnel syndrome and Drs. Chandler's and Janetzko's opinions that she suffers from migraine headaches.  (*See id.* at 6.)

In the Fifth Circuit, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)).  Although the ALJ should accord considerable weight to an opinion and diagnosis of a treating physician, the ALJ is solely responsible for determining whether a claimant is disabled.  *Id.*  A treating physician's opinion as to a claimant's disability is never entitled to controlling weight because determinations of disability are legal issues reserved for the Commissioner.  20 C.F.R. § 416.927(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).  Additionally, when evidence supports a contrary conclusion, an ALJ may reject any physician's opinion.  *Martinez*, 64 F.3d at 176.  If good cause exists, an ALJ may give a treating physician's opinion little or no weight.  *Newton v. Apfel*, 209 F.3d 448,

455-56 (5th Cir. 2000). "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 456.

The Fifth Circuit held in *Newton* that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. Thus, before deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Id*. at 456. However, the court expressly excluded from the scope of *Newton* those cases "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458. Each decision of the ALJ stands or falls based upon the reasons set forth in the decision. *Id.* at 455.

### a.     Potential Impairments

As discussed in the previous section, the ALJ's opinion does not acknowledge the medical opinions regarding carpal tunnel or migraine headaches. For reasons already stated, such failure

constitutes reversible error. On remand, the ALJ should consider the opinions regarding these potentially severe impairments consistent with 20 C.F.R. § 416.927(d)(2), *Newton*, and other pertinent case law.[11]

### b. Unacknowledged Opinions of Disability

The ALJ's opinion also does not acknowledge Dr. Janetzko's opinions of June 9, 2003, and April 21, 2004, that Plaintiff's various impairments precluded her from working. (*See* Tr. at 306, 456 (Exs. 16F and 26F in the administrative record).) Although an ALJ may reject or assign little or no weight to an opinion of a treating physician in some circumstances, the ALJ errs when he fails to even consider such an opinion. *See Newton*, 209 F.3d at 455-56. Because the ALJ's opinion does not reflect that he considered these opinions of Dr. Janetzko, the ALJ should consider them on remand.

### c. Acknowledged Opinions of Disability

Although the ALJ's opinion does not reference the opinions of Dr. Janetzko, it does briefly consider and reject other opinions that Plaintiff was disabled. (*See* Tr. at 29 (referencing "exhibits 9F/12, 23, 23F/1, and 24F/1", which respectively refer to Tr. at 243 (Nov. 4, 2002 opinion of disability by Dr. Janetzko); 254 (Apr. 10, 2001 opinion of disability by Dr. Dreschel); 426 (Oct. 23, 2003 RFC assessment by Dr. Rodriguez); 432 (July 29, 2003 RFC assessment by Dr. Janetzko). The consideration of these opinions is limited to one paragraph:

---

[11] Plaintiff's characterization of Dr. Chandler's opinion as diagnosing carpal tunnel syndrome (Pl. Br. at 6) is unsupported by the record; Dr. Chandler merely listed carpal tunnel syndrome in the context of Plaintiff's medical history. (Tr. at 344-45.) Nevertheless, in conjunction with specific restrictions noted by Drs. Janetzko and Rodriguez regarding Plaintiff's limited ability to perform repetitive actions with her hands, (*see id.* at 427, 435), Dr. Chandler's notation concerning carpal tunnel provides sufficient medical evidence to require the ALJ to consider whether carpal tunnel constitutes a severe impairment for Plaintiff commencing in April 2003. Upon remand, the ALJ may consider further developing the record in accordance with 20 C.F.R. § 416.927(c)(3).

It is noted that the claimant has been reported as unable to work (exhibits 9F/12, 23, 23F/1, and 24F/1). These reports, however, cannot be provided probative weight as they are not supported by any objective clinical findings, and the reports are in direct contrast to the claimant's actual level of functioning i.e., the evidence in the record shows that the claimant is typically able to perform household chores such as cleaning, cooking, taking care of multiple animals, driving herself around, and keeping up with the news (exhibits 6F/2, 7F/2, and 10F/2).

(Tr. at 29.)

A physician's opinion that a claimant is unable to work constitutes a medical source opinion on an issue reserved to the Commissioner. *See* 20 C.F.R. § 416.927(e)(1). Such opinions are never accorded controlling weight because determinations of disability are legal issues reserved for the Commissioner. *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). Additionally, upon a showing of good cause, an ALJ may give a treating physician's opinion little or no weight. *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000). In this instance, the ALJ declined to give the treating physician's opinions even probative weight, not because they expressed an opinion as to a legal issue, but because he viewed them as (a) inconsistent with Plaintiff's actual level of functioning as shown by exhibits 6F/2, 7F/2, and 10F/2 and (b) unsupported by objective clinical findings. (*See* Tr. at 29.) Because "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision," *see Newton*, 209 F.3d at 455, the Court must determine whether the ALJ's proffered reasons constitute good cause for rejecting the opinions.

### 1.) *Level of Functioning*

The ALJ rejected the identified opinions of Drs. Janetzko, Dreschel, and Rodriguez because he found them inconsistent with Plaintiff's actual level of functioning as shown in exhibits 6F/2, 7F/2, and 10F/2. Exhibit 6F is a psychological evaluation dated December 30, 2002, wherein Plaintiff provided the following pertinent information regarding her activities of daily living: "She

has a driver's license and knows how to drive. . . . She can cook, using the stove and microwave.

. . . She can do housework but has difficulty because of her physical problems. . . . She watches news

all the time on TV and was able to relay a recent news event." (Tr. at 206-07.) She also indicated

that "[i]f she is not hurting, she will do chores and care for her dogs." (*Id.* at 207.) Exhibit 7F is a

consultative examination dated March 12, 2003, wherein Dr. Patel noted that Plaintiff can drive and

"do basic household chores" such as cooking, dishes, laundry, sweeping, vacuuming, and grocery

shopping. (*See id.* at 211.) Dr. Patel also noted that Plaintiff "cannot walk more than a block as her

back would hurt, she can climb one flight of stairs, she cannot stand more than 10 minutes and her

back would hurt, she can sit for 1 hour and become stiff and has to get up and move around." (*Id.*)

Exhibit 10F is a psychiatric evaluation dated March 31, 2004, wherein Plaintiff informed Dr.

Meshack that "she attempts to do as much as possible around the house . . . when she is feeling up

to it." (*Id.* at 256.) Dr. Meshack also noted:

> Due to her back she is limited in what she can do and states often when she has a
> good day she will overexert herself which means she will be down for the next
> several days as a result. She denies needing any help with her activities of daily
> living. She states she is able to drive except for experiencing lower back pain and
> wrist pain.

(*Id.*)

When one compares the more detailed contents of these three exhibits with the ALJ's brief

discussion of the exhibits, it appears that the ALJ did not fully consider the information within them.

He instead appears to have selected certain information from the exhibits to find the opinions of the

treating physicians inconsistent with Plaintiff's actual level of functioning. However, "the ALJ must

consider all the record evidence and cannot 'pick and choose' only the evidence that supports his

position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citation omitted). To the extent Plain-

tiff's actual level of functioning is reflected in Exhibits 6F, 7F, and 10F, such functioning is necessarily contingent on the limitations mentioned in the exhibits[12] unless the ALJ finds the limitations not credible.[13] When one considers Exhibits 6F, 7F, and 10F as a whole, there is no apparent inconsistency between the reported daily activities and an inability to engage in substantial gainful activity as opined by Drs. Janetzko, Rodriguez, and Dreschel.

Because it appears that the ALJ failed to consider all relevant evidence of record, his stated reason for rejecting those opinions based upon a perceived inconsistency with actual level of functioning fails to demonstrate good cause for giving little or no weight to the identified opinions of Drs. Janetzko, Rodriguez, and Dreschel. Good cause does not exist when the ALJ has not considered all relevant evidence of record. *Cf. Goode v. Apfel*, No. 3:98-CV-2693-D, 1999 WL 451287, at *3 (N.D. Tex. June 29, 1999) (discussing good cause and holding that ALJ did not err in rejecting opinion "[b]ecause the ALJ did consider all relevant record evidence").

## 2.) *Unsupported by Objective Medical Findings*

The ALJ also rejected the identified opinions of Drs. Janetzko, Dreschel, and Rodriguez because he found them unsupported by objective medical findings. However, the identified opinions are not entirely unsupported by objective clinical findings. Plaintiff had surgery to alleviate pain

---

[12] For instance, while Exhibit 6F supports finding that Plaintiff will do chores and care for her dogs, such activity occurs only when Plaintiff "is not hurting" – a limitation on the activity not recognized by the ALJ. Although Exhibit 7F supports finding that Plaintiff can do basic household chores, the exhibit also notes Plaintiff's limitations on walking, climbing, standing, and sitting – limitations not given any consideration by the ALJ. The ALJ also does not consider Dr. Meshack's notations in Exhibit 10F that Plaintiff attempts to do things around the house "when she is feeling up to it", that she overexerts herself and is thus incapacitated for several days, and that her driving is limited due to pain.

[13] While the ALJ may certainly find a claimant's complaints or limitations not credible, he must do so after consideration of all the evidence. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007). In this instance, although the ALJ indicates that he considered "all the evidence" when he found Plaintiff's "statements concerning her impairments and their impact on her ability to work are not entirely credible" (*see* Tr. at 29), the Court has already found that he did not properly consider all potentially severe impairments and it now appears that the ALJ found statements in Exhibits 6F, 7F, and 10F partially credible without adequate explanation.

in her calves in 1994, she tore ligaments in her left ankle in August 1996, and tore the medial meniscus of her left knee in August 2000. (Tr. at 332, 382-85, 399-400.) In November 2003, x-rays revealed slight lower lumbar disc space narrowing. (*Id.* at 347.) An ear, nose, and throat specialist diagnosed TMJ, which can cause pain in the facial area. (*Id.* at 183.) Furthermore, Dr. Chandler specifically found that Plaintiff suffered from left limb length inequality – an impairment that is objectively verifiable. (*See id.* at 345.) While these objective clinical findings may not support every opinion made by Plaintiff's treating physicians in Exhibits 9F, 23F, and 24F, they provide some support. In such circumstances, a blanket allegation of an absence of objective clinical findings does not constitute good cause for rejecting opinions made by Plaintiff's treating physicians.

In addition, although multiple doctors diagnosed Plaintiff with fibromyalgia without stating any objective clinical findings (*see*, *e.g.*, Tr. at 243, 254, 306, 308-09, 456), the ALJ accepted fibromyalgia as a severe impairment based upon the medical evidence (*see id.* at 26-27). Despite such acceptance, he discounted Plaintiff's subjective complaints of pain as not entirely credible without fully considering the opinions of the treating physicians. (*See id.* at 26-27, 29.) A diagnosis of fibromyalgia often lacks objective clinical findings. *See*, *e.g.*, *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) (comparing cases); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003); *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 562 (7th Cir. 2000). *But see*, *e.g.*, *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003) (noting that claimant's testimony and reports were "supported by objective medical evidence of fibromyalgia"); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (noting that fibromyalgia "itself can be diagnosed more or less objectively by the 18-point test . . . but the

amount of pain and fatigue" from it cannot be objectively diagnosed).  When a claimant has an accepted diagnosis, such as fibromyalgia, that often lacks objective clinical findings, an allegation of an absence of objective clinical findings does not alone constitute good cause to reject opinions of treating physicians.  To show good cause under such circumstances, the ALJ's decision must do more than merely state that the opinions "are not supported by any objective clinical findings" as was done in this case.

For all of these reasons, the ALJ did not properly consider the opinions of Plaintiff's treating physicians, and remand is appropriate.

**D. Issue Two:  Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining her RFC because his findings do not include all limitations supported by the record.  (Pl. Br. at 11-12.)  More specifically, she contends that the ALJ failed to properly consider the limiting effects of her left leg length inequality, left knee medial meniscus tear, and musculoskeletal pain in the lumbar spine and left hip.  (*Id.* at 6.)  According to Plaintiff, by finding that she can perform light work, the ALJ ignored the opinions of her treating physicians Drs. Janetzko, Rodriguez, and Dreschel.  (*Id.* at 7-8.)  Lastly, she contends that the ALJ failed to consider the extent her somatoform disorder accounts for her subjective complaints.  (*Id.* at 8-10.)

"The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  When assessing a claimant's physical and mental abilities, the ALJ first assesses the nature and extent of the claimant's physical and mental limitations and then determines the RFC.  20 C.F.R. § 416.945(b) and (c).  A determination of RFC is "based on all of the relevant medical and other evidence" in the

record.  *Id.* § 416.945(a)(3).  "The claimant's RFC assessment is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."  *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005).  The relevant policy interpretation states in pertinent part:

> 1.  Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

> 2.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . ..

*Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1379, 1386-87 (5th Cir. 1988).

In this case, the ALJ's decision found Plaintiff physically capable of performing a wide range of the vocational demands for light work,[14] but recognized that her ability to perform such work was limited by mental impairments that restrict her with respect to detailed instructions and contact with

---

[14]  The applicable regulation defines light work as:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

others. (*See* Tr. at 31.) However, as already discussed in prior sections, the ALJ's decision did not properly consider the opinions of Plaintiff's treating physicians or all of her potentially severe impairments. Consequently, this action should be remanded for further consideration of Plaintiff's RFC. *See Myers v. Apfel*, 238 F.3d 617, 621-22 (5th Cir. 2001) (per curiam) (reversing and remanding action because the ALJ failed to consider all evidence from treating physicians when determining the claimant's RFC).

In addition, the record supports Plaintiff's contention that the ALJ's decision failed to consider the extent her somatoform disorder accounts for her subjective complaints. The ME specifically testified that a person with somatoform disorder has a psychological dysfunction even though she believes she has a physical dysfunction, that the perceived physical problems would be "real to the person experiencing them", and that there is no medicine to treat somatoform disorder. (Tr. at 485-86.) While the ALJ's decision referenced this testimony and discussed psychological impairments arising from Plaintiff's somatoform disorder, it does not consider how the disorder might impact Plaintiff's subjective physical complaints. (*See id.* at 28-32.) Proper determination of RFC requires consideration of all relevant evidence, including proper consideration of the opinions of treating physicians. *See* 20 C.F.R. § 416.945(a)(3); *Myers*, 238 F.3d at 621-22. Because the ALJ's decision failed to consider the extent to which Plaintiff's diagnosed somatoform disorder accounts for her subjective complaints, remand is in order.

On remand, the ALJ must determine Plaintiff's RFC after considering all relevant evidence and properly considering the opinions of Plaintiff's treating physicians. In light of the accepted diagnosis of somatoform disorder, the ALJ should also more thoroughly consider the impact of Plaintiff's mental impairments on her subjective complaints.

## E. Issue Three:  Failure to Carry Step 5 Burden

Plaintiff lastly argues that the Commissioner did not carry his burden at Step 5 to show that she could perform work existing in significant numbers in the national economy.  (Pl. Br. at 12.) She points out that the VE agreed that there is no available work that she can perform if all of her limitations were recognized.  (*Id.* at 13.)  Even using the ALJ's RFC determination that she can perform light work with some limitations regarding detailed instructions and contact with the public, she contends that substantial evidence does not support the finding that she can perform work that exists in significant numbers in the national economy.  (*Id.*)  With respect to this latter contention, she argues that (1)  the ALJ found her capable of working as a hand laminator when the VE testified that she could perform work as a hand laborer and (2) the ALJ found her capable of working as a janitorial cleaner or laundry worker although the Dictionary of Occupational Titles ("DOT") identifies such work as medium rather than light work.  (*Id.* at 13-14.)  She relies on SSR 00-4p to argue that it is legal error to fail to resolve a conflict between testimony from a VE and DOT.  (*Id.* at 14.)

In light of the prior reasons for remanding this case for further consideration, there is little reason to definitively decide whether the ALJ committed an error under SSR 00-4p[15] or whether the Commissioner carried his burden at Step 5.  Each of the remanded issues have the potential to alter the limitations of Plaintiff that the ALJ accepts, her determined RFC, and ultimately the questions to the VE.

---

[15] Social Security Ruling 00-4p requires that prior to relying upon evidence from a VE or vocational specialist ("VS") to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by a VE or VS and information in the DOT or its companion publication, the Selected Characteristics of Occupations ("SCO") defined in the Revised DOT.  *Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions*, SSR 00-4p, 2000 WL 1898704, at *1-2 (S.S.A. Dec. 4, 2000).  As part of his duty to fully develop the record at the hearing level, the ALJ must inquire on the record whether or not there is such an inconsistency.  *Id.* at *2.  Furthermore, the ALJ must also explain in the decision how any identified conflict was resolved.  *Id.* at *1.

## III. RECOMMENDATION

For the foregoing reasons, the Court recommends that *Plaintiff's Cross Motion for Summary Judgment* be **GRANTED,** *Commissioner's Motion for Summary Judgment* be **DENIED**, and the decision of the Commissioner be **REVERSED** and the case be **REMANDED** for reconsideration.

**SO RECOMMENDED**, on this **29th** day of April, 2008.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE